[Civil No. 4702.   Filed June 19, 1944.]

[150 Pac. (2d) 89.]

J. R. McDOUGALL, as Commissioner of the State Department of Social Security and Welfare; W. P. MAHONEY, MRS. GEORGE V. EBERLE, MRS. JOHN M. NEAL, HOWARD AMES and LOUIS ESCALADA, Each and All as Members of the State Board of Social Security and Welfare, Appellants, v. ANA FROHMILLER, as State Auditor for the State of Arizona; and J. D. BRUSH, as State Treasurer for the State of Arizona, Appellees.

Mr. J. R. McDougall, in *Propria Persona* and as Attorney for Appellants.

Mr. Allan K. Perry and Mr. L. V. Rhue, for Appellee Frohmiller.

STANFORD, J.—This is an appeal from the Superior Court of Maricopa County wherein that court granted the motion of the State Auditor and the State Treasurer of Arizona to dismiss the appellants' complaint for a declaratory judgment on the ground that the complaint filed failed to state a claim upon which relief could be granted.

The issue involves funds for the construction of an addition to the State Tubercular Welfare Sanatorium located in Maricopa County. Further facts and the duties and powers of the State Board of Social Security and Welfare will be disclosed hereafter and by the following code section:

"70–107. *Activities of the state department.*—The state department shall be charged with the administration of all the welfare activities of the state as hereinafter provided. The state department shall:

"(a) Administer all forms of public assistance including general home relief, outdoor and indoor care and medical care for persons in need, old age assistance, aid to dependent children, aid to the blind, service to crippled children; and shall administer all institutions now administered by the State Board of Public Welfare; supervise agencies and institutions caring for dependent or mentally or physically handicapped or aged adults; approve the incorporation of charitable agencies; and administer such other welfare activities or services as may be vested in it; provided, however, that nothing in this section shall be construed to mean the state institutions operated by the Board of Directors of State Institutions;

"(b) Administer all child welfare activities, including importation of children; licensing and supervising of private and local public child-caring agencies and institutions; the care of dependent, neglected and delinquent children in foster family homes, or in institutions, especially children placed for adoption;

"(c) Establish and administer a program of service for children who are crippled or who are suffering from conditions which lead to crippling, which shall provide for developing, extending, and improving services for locating such children, and for providing for medical, surgical, corrective, and other services and care, and facilities for diagnosis, hospitalization, and aftercare; supervise the administration of those services included in the program which are not administered directly by it; extend and improve any such services, including those in existence on the effective date of this act; cooperate with medical, health, nursing, and welfare groups and organizations, and with any agency of the state charged with the administration of laws providing for vocational rehabilitation of physically handicapped children; to cooperate with the federal government, through its appropriate agency or instrumentality in developing, extending, and improving such services; and receive and expend all funds made available to the department by the federal government, for services to crippled children, the state or its political subdivisions, or from other sources, for such purposes;

"(d) Develop such agencies as it may deem necessary for providing services to the blind including the prevention of blindness, the location of blind persons, medical service for eye conditions, vocational guidance and training of the blind, placement of blind persons in employment, instruction of the adult blind in their homes, and other social services for blind persons; or cooperate with such similar agencies already established;

"(e) Assist other departments, agencies and institutions of the state and federal governments, when so requested, by performing services in conformity with the purposes of this act;

"(f) Act as the agent of the federal government in the furtherance of any functions of the state department;

"(g) Carry on research and compile statistics relative to the entire public welfare program throughout the state, including all phases of dependency, defectiveness, cooperate with the superior courts in cases of delinquency and related problems; and develop plans in cooperation with other public and private agencies for the prevention as well as treatment of conditions giving rise to public welfare and social security problems; to make the necessary expenditures in connection therewith;

"(h) Make such rules and regulations, and take such action deemed necessary or desirable to carry out the provisions of this act, and which are not inconsistent therewith; . . . ."

On the 5th day of September, 1942, the State Department of Social Security and Welfare adopted a resolution in reference to the operation of a tubercular sanatorium for the treatment of cases of tuberculosis. The resolution sets out that:

"Whereas, it appears to this board that the postwar period may cause a decided increase in the number of persons who could be treated in a sanatorium similar to the one operated by this department, and would be eligible for such treatment due to their inability to provide financially for the same; and

"Whereas, this board feels that proper plans should be made to meet this anticipated problem and that it should at this time take steps to provide a resource whereby facilities for the treatment of such patients may be acquired or constructed; Now, therefore,

"Be it resolved: That there be established on the books of this department an account to be designated as State Welfare Tubercular Sanatorium Building Fund and that there be allocated to said account out of the unencumbered and unexpended funds available in the Public Welfare Fund as of September 1, 1942, the sum of $50,000.00, and that said sum be not expended for any purpose other than the construction and furnishing of additions to the existing facilities of the department's tubercular sanatorium unless specifically authorized by resolution of this board; and

"Be it further resolved; That the State Auditor be requested to establish such an account on her books and to transfer to said account from the Public Welfare Fund said sum of $50,000.00 and that she not authorize the same to be used for any other purpose except for the construction and furnishing of additions to the existing tubercular sanatorium of the welfare department unless otherwise directed by resolution of this board."

The Board on May 1, 1943, adopted a further and similar resolution pertaining to setting aside the additional sum of $100,000.

The said Board, after the adoption of said resolutions, entered into an agreement with H. H. Green, an architect of Phoenix, Arizona, for the purpose of making a survey of the existing facilities at the State Welfare Tubercular Sanatorium, together with preliminary plans for the extension and construction of additional buildings. The said Green submitted his claim for $225.00 for his services to the State Auditor and the same was rejected on June 30, 1943, and later again rejected. However, later, the claim having been

approved by the Governor of Arizona, the auditor issued a warrant for the payment of same.

The Sixteenth Legislature of the state, in its regular session in 1943, provided for the lapsing of appropriations; discontinuance of continuing appropriations; and the reversion under certain conditions of unexpended funds at the close of the fiscal year ending June 30, 1943, but it is the contention of the appellants that their action taken in connection with the establishment of the State Welfare Tubercular Sanatorium Building Fund or Account, is authorized by the laws under which the department has operated and is operating, and that such action in effect constituted an appropriation of funds for construction and capital improvement to facilities operated under the jurisdiction of the appellants, and that the fund appropriated by them did not lapse or revert as a result of the passage of Chapter 86, Laws 1943, Regular Session (Code Supp. 1943, § 10–901 *et seq.*), above referred to, and it is the further contention that said appropriation will not lapse until the purposes for which it was made shall have been accomplished or abandoned, particularly since there has been an encumbrance and an expenditure from the appropriation from the preceding fiscal biennium.

Section 1 of Article 3 of the aforesaid Chapter 86 reads as follows:

"*General fund and separate funds.*—All funds received for and belonging to the state shall be paid into the state treasury and credited to the general fund except the following, which shall be placed and retained in separate funds: (a) the unexpendable principal of moneys received from federal land grants shall be placed in separate funds and the account of each such separate fund shall bear a title indicating the source and the institution or purpose to which such fund belongs. (b) The interest, rentals and other expendable money received as income from

federal land grants shall be placed in separate accounts, each account bearing a title indicating the source and the institution or purpose to which the fund belongs. Such expendable funds shall be expended only as authorized, regulated and controlled by the general appropriation bill or other act of the legislature. (c) All federal funds granted and paid to the state by the federal government for specific purposes shall be placed in separate accounts, each account bearing a title indicating the source and purpose of the fund and all state appropriations for matching such federal funds shall be transferred from the general fund to such separate funds as needed, except as otherwise required by the federal government. (d) All private or *quasi*-private funds authorized by law to be paid to or held by the state treasurer shall be placed in separate accounts, each account bearing a title indicating the source and purpose of such fund. (e) All funds legally pledged to the retirement of building indebtedness or bonds issued by those institutions authorized to incur such indebtedness or to issue such bonds shall be placed in separate accounts. (f) All monies collected by the state game and fish department shall be deposited in a special fund to be known as the 'State Game and Fish Protection Fund,' for the use of the state game and fish commission in carrying out the provisions of chapter 57, Arizona Code, 1939.

"No money shall be received or held by the state treasurer except as authorized by law and in every instance he shall issue his receipt for money received and deliver a duplicate of such receipt to the state auditor and no money shall be withdrawn from the treasury except upon the auditor's warrant."

And Section 7 of Article 4, is as follows:

"*Lapsing appropriations.*—No officer or other agency of the state shall, after the close of any fiscal year, incur or order or approve the incurring of any obligation or expenditure under any appropriation made by the legislature for such fiscal year, and no expenditure shall be made from or be charged to any appropriation made by the legislature for any

fiscal year that shall have expired at the time the obligation for such expenditure was incurred. The state auditor is authorized to draw warrants, against the available balances of appropriations made for a fiscal year, for a period of one (1) month after the close of such fiscal year, for the payment of obligations incurred during the fiscal year for which such appropriations were made or in fulfillment of contracts properly made during such year and for no other purpose whatsoever, provided that such goods were received or services rendered prior to the close of such fiscal year. After the expiration of such period of one (1) month from the beginning of each fiscal year, all balances of appropriations for the prior fiscal year shall lapse and no further payments shall be made on any claim on account of expenditures of such prior fiscal year. Appropriations for construction or other permanent improvements shall not lapse until the purpose for which the appropriation was made shall have been accomplished or abandoned unless such appropriation has stood during the entire fiscal biennium without an expenditure therefrom or encumbrance thereon. Nothing in this section shall be construed to require the revertment to the general fund of any balance derived wholly or partly from federal grants, earnings or other sources, and remaining in any special revenue, endowment, interest, redemption, or suspense agency fund at the close of the fiscal year unless expressly so provided by law, nor to require the revertment to the general fund of any balance of fiscal year or biennium appropriations made for the University of Arizona."

The case of *Webb* v. *Frohmiller*, 52 Ariz. 128, 79 Pac. (2d) 510, 513, is where the Tax Commission of Arizona attempted to assume the expenses of additions and furnishings to quarters to be occupied by it in the new addition to the capitol building and pay for same out of appropriations to it for its administration of the income tax, sales tax and luxury tax acts, and we quote from that case:

" . . . On the 14th of April, 1938, therefore, it adopted a resolution stating that its quarters were inadequate, and that the board of directors of state institutions had allotted to it certain quarters in the new building, provided the tax commission would make all additions, changes and alterations in the quarters assigned, and install the equipment and furnishings necessary for carrying on its business in the new quarters out of its own funds. . . . The total cost of the work which the commission desires to do, as aforesaid, is approximately $53,000.00. . . .

"There are three questions raised by the parties in their briefs, (a) is the expenditure of the sum proposed by the tax commission authorized without the commission first calling for bids, (b) may the money appropriated for the tax commission, under the provisions of the three acts as above referred to, be used to pay for improvements in the addition to the capitol building, of the character above set forth, and (c) if it may be used at all for that purpose, can it be used to install a cooling system sufficient to cool the entire addition.

"We think the case can, and should be, disposed of on the second proposition. It is axiomatic that no money can be paid from the state treasury unless and except the legislature or the constitution itself has made an appropriation therefor, and it can only be used then for the purposes specified by the appropriation. *Crane* v. *Frohmiller,* 45 Ariz. 490, 45 Pac. (2d) 955. The general proposition is not, and cannot be, disputed by plaintiff, but it is contended that the legislature has made an appropriation to the tax commission of four per cent, respectively, of the collections of the income tax, the sales tax and the luxury tax, in such a manner that it can be expended for the objects now desired by the commission and set forth above. That an appropriation of the amount stated was made is true, but it is necessary before money may be drawn from the state treasury not only that the appropriation shall be made, but that it shall appear that the money is to be applied to the purpose of that appropriation. What are those purposes?

They are stated in substantially the same language in each of the three acts. That language is, in substance.

" 'For the purpose of carrying out the provisions of this act there is hereby appropriated . . . The necessary expenses of the administration of this act shall be paid . . . .' . . . "It is true that there might, perhaps, be a sudden emergency arising where expenses of administration would include the renting of office room, but the proposal of the commission goes far beyond any of these things. . . .

"Since the legislative appropriation on which this application was based did not authorize expenditure of the money in question for the purpose for which it is sought to be used, the petition for the writ is denied."

While the facts are not similar we think the case quite controlling in the instant one.

As we see it, under Section 70–107 our code, *supra,* the nearest that section gives the privilege to the appellants to appropriate the funds in question would be subdivision (g) which reads again as follows:

"(g) Carry on research and compile statistics relative to the entire public welfare program throughout the state, including all phases of dependency, defectiveness, cooperate with the superior courts in cases of delinquency and related problems; and develop plans in cooperation with other public and private agencies for the prevention as well as treatment of conditions giving rise to public welfare and social security problems; to make the necessary expenditures in connection therewith."

We hold that neither said subdivision (g) Section 70–107 nor any other part of our code empowers the appellants to construct the building addition referred to herein; that the appellant is not excepted from the provisions of Section 1, Article 3, Chapter 86, Session Laws of 1943 (Sec. 10–912, 1943 Supp.) nor under

Section 7, Article 4, Chapter 86, Session Laws of 1943 (Sec. 10–930, 1943 Supp.).

Our desire that we might find the path leading to an opposite expression of the law or our knowledge of the great need of the additional structure, does not clothe us with the authority to uphold the views of the appellants.

Otherwise stated, we hold that the fund here involved cannot be appropriated for construction or other permanent improvements of that character and that all the unencumbered balances in the funds of the State Department of Social Security and Welfare lapsed as of July 1, 1943, under Chapter 86 of the Laws of 1943.

Judgment is affirmed.

McALISTER, C. J., and ROSS, J., concur.